Rockingham
No. 94-107

KATHY O'DONNELL

v.

MOOSE HILL ORCHARDS, INC. & a.

January 31, 1996

*DeSaulnier & Siegal, P.A.*, of Portsmouth (*Byron J. Siegal* on the brief and orally), for the plaintiff.

*Sullivan & Gregg, P.A.*, of Nashua (*Richard A. Mitchell* on the brief and orally), for the defendants.

THAYER, J. The plaintiff, Kathy O'Donnell, brought an action against the defendants, Moose Hill Orchards, Inc. d/b/a Macks Apples (Moose Hill), and Andrew Mack, alleging that pesticide spraying in the defendants' orchards resulted in the illness and death of horses on the plaintiff's land. A jury returned a verdict in favor of the defendants. On appeal, the plaintiff alleges that the

Superior Court (*McHugh*, J.) committed a number of errors regarding the admission of expert testimony. We affirm.

The plaintiff owns a horse farm on which she boards, raises, and breeds thoroughbred race horses. The plaintiff's property abuts the apple orchards of defendant Moose Hill. The orchard is sprayed with pesticides and other chemicals. During the spring of 1983, twenty-two horses at the plaintiff's farm experienced colic and eight of those twenty-two later died. The plaintiff alleged that spraying pesticides on the orchards resulted in the illness and death of the horses.

At trial, both the plaintiff and the defendants presented expert witnesses. Dr. Frederick Oehme, a veterinary toxicologist, testified for the plaintiff. Dr. Oehme testified that due to horses' unique digestive systems, they are highly susceptible to colic, and that any foreign object, such as a pesticide, can induce colic. Dr. Oehme further testified that in his opinion the colic and subsequent deaths suffered by the plaintiff's horses were caused by pesticides drifting from the orchards onto the plaintiff's pasture.

Dr. Oehme also explained that a chemical's LD-50 is a measurement of its toxicity. It indicates the quantity of the chemical that will constitute a lethal dose to fifty percent of a given population. Dr. Oehme explained that the LD-50 measure is a crude measure of toxicity based on experiments done on laboratory animals, mainly mice and rats. He testified that he did not think that a chemical's LD-50 was a good indicator in this case because it did not account for illness caused by chemicals; it only measured deaths. Additionally, he noted that because of its unique digestive system, a horse is "much more sensitive to gastrointestinal pain, irritation, and it's much more likely to show problems from considerably lower doses than are going to kill mice."

The defendants' expert, Dr. Robert Poppenga, also a veterinary toxicologist, testified that while he did not know what caused the illness and death of the plaintiff's horses, "the pesticides were not most likely involved." He further testified on cross-examination, that while he could not state what dosage of the chemicals used on the orchards would constitute a toxic dose, because the chemicals "have not been investigated specifically in horses," the chemicals used on the orchard "have just a very large LD-50 [and] would be considered to be safe."

The contested testimony in this case was given by Dr. Alan T. Eaton, an entomologist from the University of New Hampshire called as an expert by the defendants. Prior to trial, the plaintiff had moved *in limine* to exclude Dr. Eaton's testimony because: (1) his

proposed testimony and *curriculum vitae* had never been supplied to the plaintiff; (2) he was not qualified to testify as an expert regarding the effect of the chemicals on the horses; and (3) he had no personal knowledge regarding the incidents at the plaintiff's farm and therefore could not testify as a lay witness. The trial court denied the motion, but stated that the plaintiff could *voir dire* Dr. Eaton as to his expertise regarding LD-50's.

At trial, Dr. Eaton testified that in 1983, he was a participating author and editor of the New England Pesticide Control Guide. Additionally, he was familiar with the pesticides used on apple orchards and with pesticide safety and application procedures. Dr. Eaton stated that in compiling the pesticide control guide, the experts involved, himself included, consider the toxicity of the various chemicals. They consider both chronic toxicity, when the effect of a chemical is not immediately apparent, and acute toxicity, when the effect is noted within a short time after exposure. Acute toxicity is measured by a chemical's LD-50. Dr. Eaton noted that even though horses and other livestock were not used as test animals in determining a chemical's LD-50, the LD-50 is the best available measure of the toxicity of pesticides.

Dr. Eaton then demonstrated to the jury how an LD-50 is calculated. He explained that "the LD-50 is a number, and that number is actually the number of milligrams of pesticide or chemical that are required for every kilogram of body weight of your test animals in order to achieve 50 percent kill of your test population." Dr. Eaton calculated the LD-50 of table salt and Dithane, a chemical used on the orchard, for a horse based on an estimated average weight of a thoroughbred horse. Dr. Eaton also determined, based on the level of pesticide found on the plaintiff's property, the volume of contaminated hay that a horse would have to eat in order to consume a lethal volume of the pesticide. On cross-examination, Dr. Eaton admitted that there were no LD-50's available for combinations of chemicals, and that combining chemicals could result in different LD-50's than the chemicals would have individually.

On appeal, the plaintiff argues that the trial court erred by allowing Dr. Eaton to offer opinion testimony regarding the toxicity of the pesticides used by the defendants because: (1) Dr. Eaton was not qualified to act as an expert on these issues at trial; (2) the trial court did not initially inquire into Dr. Eaton's qualifications; and (3) pretrial discovery materials regarding Dr. Eaton's qualifications and opinions were not provided to the plaintiff prior to trial.

We first address the plaintiff's assertion that Dr. Eaton's testimony should have been excluded because the defendants failed to

provide the plaintiff with Dr. Eaton's qualifications and opinions prior to trial. The plaintiff raised this argument through one of her motions *in limine*. A hearing was held on these motions; however, a copy of the transcript was not provided to the court. The appealing party "is responsible for presenting a record sufficient to allow the court to decide the issue presented on appeal." *Rix v. Kinderworks Corp.*, 136 N.H. 548, 553, 618 A.2d 833, 836 (1992). Absent such a record, we limit our review to "the legal errors apparent on the face of the record." *Id.* (quotation omitted).

◼  We are not persuaded, based on the record before us, that the trial court erred as a matter of law when it allowed Dr. Eaton to testify for the defendants. A party is entitled to disclosure of an opposing party's experts, the substance of the facts and opinions about which they are expected to testify, and the basis of those opinions. *Hydraform Prods. Corp. v. American Steel & Alum. Corp.*, 127 N.H. 187, 201, 497 A.2d 339, 348 (1985). Failure of a party to supply such information should result in the exclusion of expert opinion testimony unless good cause is shown to excuse the failure to disclose. *Id.* at 202, 498 A.2d at 348. Based on the facts in this case and absent a transcript of the hearing, however, we are not persuaded that the trial court could not have found that good cause existed to excuse the defendants from any failure to supply required discovery. We do know that the trial court could have considered, at a minimum, the following. The defendants told the plaintiff that they intended to call Dr. Eaton three months before the trial began, giving her an opportunity to depose him before trial. While they failed to tell the plaintiff that Dr. Eaton would calculate specific LD-50's and apply them to this case, she was prepared for such testimony. Her own expert, Dr. Oehme, explained the function served by LD-50's and highlighted reasons why he believed such measurements were inappropriate when applied to horses. Equally important, the defendants told the plaintiff that they would call other experts who the plaintiff believed would discuss LD-50's. As we do not find, as a matter of law, error on the face of the record, we affirm the ruling of the trial court. *Cf. Rix*, 136 N.H. at 553-54, 618 A.2d at 836.

◼  The plaintiff next argues that the trial court erred by failing to make an initial inquiry into the qualifications of Dr. Eaton prior to allowing his testimony. The trial court is not required to make an explicit finding regarding a witness's qualifications as an expert. *Emery v. Company*, 89 N.H. 165, 169, 195 A. 409, 412 (1937) ("[T]he fact that a witness is permitted to give expert testimony implies a finding by the trial court that he was qualified to testify in that

capacity."). Based on the discussion of Dr. Eaton's credentials and the admission of his *curriculum vitae*, it is clear that the trial court, by inference, ruled that Dr. Eaton was qualified as an expert witness. *See id*. Additionally, the trial court explicitly found that Dr. Eaton had sufficient expertise in working with pesticides to "use any reasonable method to show insignificant toxicity levels with respect to 'this case."

■ The plaintiff, however, argues that the trial court abused its discretion by allowing Dr. Eaton to give opinion testimony because he was not qualified as an expert on LD-50's, toxicology, or veterinary toxicology.

> The trial court has broad discretion to permit a witness to offer expert testimony. If the witness, by either study or experience, has knowledge on the subject-matter of his or her testimony so superior to that of people in general concerning it that the witness's views will probably assist the trier of fact, the admission is not error.

*Public Serv. Co. of N.H. v. Town of Bow*, 139 N.H. 105, 108, 649 A.2d 65, 67 (1994) (quotation and citation omitted); *see* N.H. R. EV. 702. "The party offering the witness as an expert bears the burden of establishing the witness's qualifications." *State v. Paris*, 137 N.H. 322, 331-32, 627 A.2d 582, 588 (1993). We will not reverse a trial court's allowance of expert testimony absent a clear abuse of discretion. *Id*. at 332, 627 A.2d at 588.

Dr. Eaton is an entomologist for the University of New Hampshire's Cooperative Extension. He is the statewide integrated pest management coordinator. He has published numerous articles and is an editor and participating author of the New England Pesticide Control Guide. He testified that he was familiar with pesticide safety and application procedures and that he has addressed the toxicity of specific pesticides in working on the pesticide control guide.

The plaintiff objected to Dr. Eaton's testimony regarding the application of specific LD-50 figures to horses. The plaintiff argued that Dr. Eaton was not qualified as an expert on toxicology or on the toxic effects of the pesticides on horses. The trial court found that Dr. Eaton's testimony regarding the application of LD-50's to an animal the size of a thoroughbred horse was relevant. The court recognized that "there is no suggestion by either counsel that there is a better way of measuring toxicity other than the recognized LD-50 process." It, therefore, allowed Dr. Eaton to testify regarding the calculations that would be needed to determine what

quantity of a given substance would be lethal in an animal the size of an average horse. The court also allowed Dr. Eaton to use test results regarding the level of contamination in the plaintiff's pastures to determine the amount of food an animal would have to consume to receive a lethal dose of the pesticide. The court ruled that "the issue of the measure of toxicity, namely the LD-50 measurement, was introduced in this case by the plaintiff," and that "unless there is some attempt to show the practical effect of what these LD-50's are, then the jury is left with the misconception that this LD-50 thing . . . is so bad that it means that a speck of this pesticide consumed in any way . . . translates into sickness and death."

The testimony offered by Dr. Eaton consisted of little more than an exercise in arithmetic. A chemical's LD-50 is expressed in terms of the number of milligrams of a pesticide or chemical that are required per kilogram of body weight to result in the death of fifty percent of a target population. Dr. Eaton simply plugged figures into a process that was originally introduced by the plaintiff's witness.

The plaintiff argues that this application of the LD-50 figures was improper because the figures were developed through testing on laboratory animals, and there was no evidence regarding the pesticide's toxicity to horses. We disagree. "The appropriate method of testing the basis of an expert's opinion is by cross-examination of the expert." *Tullgren v. Phil Lamoy Realty Corp.*, 125 N.H. 604, 610, 484 A.2d 1144, 1148 (1984). The plaintiff's attorney fully explored the validity of Dr. Eaton's use of the LD-50's on cross-examination. The trial court's finding that the testimony of Dr. Eaton would be helpful to the jury was not an abuse of discretion.

The plaintiff also argues that Dr. Eaton gave opinion testimony regarding causation. Two statements of Dr. Eaton arguably address causation. The first, which was in response to a question by the plaintiff's attorney, related to whether a pesticide dosage of less than the LD-50 could have resulted in the horses' death. The second related to the likelihood that half of the plaintiff's horses would be unnaturally sensitive to pesticides. Both of these opinions fell within the experience of Dr. Eaton and may have been helpful to the jury. *Cf. State v. Wallace*, 125 N.H. 633, 635, 484 A.2d 1150, 1151 (1984). While it is true that Dr. Eaton is not a toxicologist, he is a specialist in the application of pesticides. As such, he was familiar with the effect such poisons could have on animals. The trial court found that Dr. Eaton was qualified and that his testimony was necessary to avoid misleading the jury. We cannot say that this determination

was an abuse of discretion. The decision of the trial court is affirmed.

*Affirmed.*

HORTON and BRODERICK, JJ., did not sit; the others concurred.