Strafford
Nos. 2006-305
    2008-312

THE STATE OF NEW HAMPSHIRE

v.

KEVIN C. WHITTAKER

Argued: April 16, 2009
Opinion Issued: June 3, 2009

*Kelly A. Ayotte*, attorney general (*Susan P. McGinnis*, senior assistant attorney general, on the brief and orally), for the State.

*Douglas, Leonard & Garvey, P.C.*, of Concord (*Richard J. Lehmann* on the brief and orally), for the defendant.

DALIANIS, J. The defendant, Kevin C. Whittaker, appeals his conviction by a jury for negligent homicide. *See* RSA 630:3, II (2007). On appeal, he contends that the Superior Court (*Fauver*, J.) erred by: (1) denying his motion *in limine* to exclude the testimony of the State's accident reconstruction expert; (2) granting the State's motion *in limine* to exclude certain portions of the testimony of a state trooper; and (3) denying his motion for new trial based upon ineffective assistance of counsel. We reverse and remand.

## I. Background

The jury could have found the following facts. At approximately 12:50 a.m. on Sunday, November 21, 2004, a rainy and foggy night, the Durham police received a call telling them that a person was lying on Main Street. The man, later identified as Richard Hegerich, was lying parallel to the fog line, near the sidewalk curb. He was dressed in dark clothing. His face was covered with blood, and he was missing his shoes and socks. One of his shoes, a sock and his hat were in the roadway, some distance away from his body.

The police determined that Hegerich, who was twenty years old, was dead. A medical examiner later concluded that Hegerich died of multiple

blunt trauma to the head caused by a motor vehicle accident. It was also determined that Hegerich had a blood alcohol content of .14. Based upon the position of his body, and the positions of his shoe, sock and hat, the police concluded that he had not been in the crosswalk when he was hit. The police found no evidence of skid marks.

At approximately 12:48 a.m., the defendant, then a nineteen-year-old student at the University of New Hampshire (UNH), called his girlfriend, Whitney Sawin, also a UNH student, and told her to meet him. Although she initially refused, Sawin eventually agreed to meet the defendant behind his fraternity house because he insisted. As Sawin walked towards the defendant's vehicle, she could see that the passenger side windshield was "completely shattered" and that "part of it was swinging inside." Sawin asked the defendant what had happened, and he told her that he had hit someone. The defendant seemed nervous and shaky. He asked Sawin to "go with" him. Sawin declined and told him to return to where he had hit the person; the defendant drove off.

At approximately 1:07 a.m., a UNH police officer stopped the defendant's car because one of its headlights was not working. The officer noticed that the car's passenger side windshield looked smashed. The defendant told the officer that a friend had been driving his car, but he could not name the friend, telling the officer instead that "it was some guy" whom he did not know very well.

While speaking to the defendant, the officer noticed that his eyes were glassy and bloodshot, he smelled of alcohol and his hands were shaking. She further observed that there were shards of glass all over the passenger seat. The defendant told the officer that he was on his way to see his girlfriend. When the officer asked the defendant if he had been drinking, he said, "[N]o. . . . [Y]ou only asked about alcohol, right?" He told the officer that he had taken illegal substances a couple of weeks earlier.

The officer then administered field sobriety tests to the defendant, and, based upon his performance, arrested him for driving while intoxicated. The officer transported the defendant to the UNH police station, where he agreed to a breathalyzer test. While waiting for the test, the defendant made several comments about wishing that "[he] could be a rat" or a "snitch." The breathalyzer test results showed that the defendant's blood alcohol content was .16.

After additional breathalyzer tests, the defendant was taken to the Durham police station to be interviewed. The defendant told the police that he wanted "to talk to his girlfriend and get his story straight." He told police that he had been asleep at his fraternity house when someone woke him because his phone was ringing. He said that he then spoke to his

girlfriend and was driving his car to meet her when the police stopped him. He was very evasive about whether he had been driving the car earlier in the evening.

At 8:30 a.m. the defendant volunteered that he had hit a pedestrian. He asked the booking officer, "[D]id I kill the man I hit[?]" After he was told that he had, the defendant said: "[W]hat have I done? What have I done to the victim's family? How am I going to live the rest of my life knowing I killed someone?" He then told the police that he had been drinking in Dover with his girlfriend that night and had then gone to his fraternity, where he had continued to drink. He said that the accident occurred when he was heading south on Main Street up a hill, driving under the speed limit, and that he never saw the victim until he "felt a thump." He then said, "[I]f my headlight wasn't out, I might not have killed him. Six inches, that's it. Six inches and the guy would have made it across the road and would be alive. He almost made it across the road. I saw him bounce off the corner of my car at the right . . . headlight area."

The grand jury returned three indictments against the defendant: two alternative counts of negligent homicide, see RSA 630:3; and one felony count of conduct after an accident, see RSA 264:25, :29 (2004). The trial court dismissed one of the negligent homicide indictments before trial.

At trial, the defendant stipulated that: (1) Hegerich died as a result of the injuries he sustained in the accident; (2) the defendant was driving the car that struck Hegerich; and (3) the defendant was impaired when he was driving. The issue for the jury on the negligent homicide charge, therefore, was whether the defendant's impairment had caused the accident. See RSA 630:3, II; State v. Wong, 125 N.H. 610, 620 (1984) (to sustain a conviction under RSA 630:3, II, the State must establish a causal connection between the person's driving under the influence, the subsequent collision and the resulting death).

To establish causation, the State relied, in part, upon the testimony of Joseph DiGregorio, then a deputy sheriff for Strafford County and a consultant for Collision Forensics in Somersworth, whom the court certified as an expert in traffic accident reconstruction. Based upon his review of the accident report prepared by a state trooper, reports prepared by the Durham and UNH police, the medical examiner's report, his own view of the collision site and the vehicle, and certain research and data, DiGregorio testified that: (1) the defendant was driving thirty-five miles per hour when the accident occurred, which is ten miles over the posted speed limit; (2) the defendant did not see Hegerich before hitting him; (3) Hegerich was in the roadway, not in the crosswalk, when the defendant hit him; (4) Hegerich was walking, not running, when he was hit; (5) because Hegerich was wearing blue jeans and a dark fleece jacket, it was difficult to see him on the

roadway; (6) the rain and fog also made it difficult to see on the night of the accident; (7) alcohol slows down perception and reaction time; (8) although a precise point of impact could not be calculated, the area of impact was approximately twenty feet to the east of where Hegerich's hat and sock were located; (9) after hitting Hegerich, the defendant applied normal braking and came to a stop approximately 167 feet from the area of impact; and (10) Hegerich came to rest approximately 160 feet from the area of impact.

Following a five-day trial, which included an early evening view, the jury convicted the defendant of both negligent homicide and conduct after an accident. He later moved for a new trial on the negligent homicide charge on the ground that his trial counsel was ineffective because he failed to consult with an accident reconstruction expert. The trial court denied the motion, and this appeal followed.

## II. Defendant's Arguments

### A. Trial Court's In Limine Rulings

The defendant first challenges certain of the trial court's *in limine* rulings. Specifically, he argues that by granting the State's motion *in limine* to exclude portions of Trooper William Graham's testimony, the trial court violated his constitutional right to present all proofs favorable. *See* N.H. CONST. pt. I, art. 15; U.S. CONST. amends. V, XIV. The defendant also argues that the trial court erred when it denied his motion *in limine* to exclude DiGregorio's testimony because it was inadmissible under RSA 516:29-a (2007).

The defendant, however, has failed to demonstrate that he preserved these arguments by raising them in the trial court. As the appealing party, the defendant has the burden of providing this court with a record sufficient to demonstrate that he raised all of his appeal issues before the trial court. *Bean v. Red Oak Prop. Mgmt.*, 151 N.H. 248, 250 (2004); *see* SUP. CT. R. 13, 16(3)(b). The record provided on appeal fails to demonstrate that the defendant ever raised the same arguments that he raises here with respect to the trial court's *in limine* rulings. We, therefore, decline to address them.

### B. Motion for New Trial

The defendant next contends that the trial court erred when it denied his motion for a new trial based upon ineffective assistance of counsel. He asserts that his trial counsel was ineffective because he failed to consult an accident reconstruction expert.

The defendant's claim of ineffective assistance of counsel rests upon Part I, Article 15 of the State Constitution and the Sixth and Fourteenth Amendments to the Federal Constitution. We first examine the constitutional competency of counsel's performance under the State Constitution, and rely upon federal case law only for guidance. *State v. Kepple*, 155 N.H. 267, 269 (2007). Because the standard for determining whether a defendant has received ineffective assistance of counsel is the same under both constitutions, necessarily, we reach the same result under the Federal Constitution as we do under the State Constitution. *Id.*

■ The State and Federal Constitutions guarantee a criminal defendant reasonably competent assistance of counsel. *State v. Sharkey*, 155 N.H. 638, 640 (2007). To prevail upon a claim for ineffective assistance of counsel, a defendant must show, first, that counsel's representation was constitutionally deficient and, second, that counsel's deficient performance actually prejudiced the outcome of the case. *Id.* at 640-41. To meet the first prong of this test, the defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To meet the second prong, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Id.* at 698; *Dugas v. Coplan*, 428 F.3d 317, 327 (1st Cir. 2005). Therefore, we will not disturb the trial court's factual findings unless they are not supported by the evidence or are erroneous as a matter of law, *Kepple*, 155 N.H. at 270, and we review the ultimate determination of whether each prong is met *de novo, see State v. Jennings*, 155 N.H. 768, 772 (2007).

### 1. Deficient Performance

#### a. Relevant Law

■ We first address the deficient performance prong of the *Strickland* test, which turns upon a determination of whether "counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. We must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of that conduct. *Id.* at 690.

■ "[T]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quotation omitted). To establish that his trial

attorney's performance fell below this standard, the defendant "has to show that no competent lawyer" would have failed to consult with an accident reconstruction expert. *Lynch v. Ficco*, 438 F.3d 35, 49 (1st Cir.), *cert. denied*, 549 U.S. 892 (2006).

■ "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (quotation omitted); *see Sharkey*, 155 N.H. at 641.

■ ■ "We apply the *Strickland* standard to evaluate an attorney's strategic choices in light of the investigation that led to those choices." *Dugas*, 428 F.3d at 327.

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91. Thus, the issue in this case is whether the decision of the defendant's trial counsel not to consult with an accident reconstruction expert was supported by investigation that was itself reasonable. *See Dugas*, 428 F.3d at 328.

■ In assessing the reasonableness of trial counsel's decision not to consult with an expert, we "recognize that reasonably diligent counsel are not always required to consult an expert as part of pretrial investigation in a case involving the use of expert witnesses by the state." *Id.* A defendant's attorney is not required, in every case, to consult experts even if the State will be putting on expert witnesses. *Id.* at 329. A defense attorney may have no duty to consult with an expert, for instance, when there is "no need to question the validity of the government's proposed evidence or the evidence may be so weak that it can be demolished on cross-examination." *Id.*

In *Dugas*, the First Circuit Court of Appeals ruled that defense counsel's failure to consult with an arson expert so as to investigate thoroughly a "not arson" defense was constitutionally deficient. *Id.* The court reached this conclusion, in part, because creating reasonable doubt that the fire was arson was one of the only defenses available to the defendant. *Id.* The only other defense was that someone else committed the arson, which, the court observed, was a difficult defense to mount. *Id.* Additionally, the court noted, the arson evidence "was the cornerstone of the state's case." *Id.* Further, the defendant's attorney admitted that he lacked any knowledge about arson investigation and had never before tried an arson case. *Id.* Defense counsel also admitted that he was aware that there were inconsistencies in the testimony of the State's arson experts. *Id.* at 330. All of these circumstances together, the court ruled, "demonstrate the inescapable need for expert consultation in this case." *Id.* at 331. The court also rejected the State's claim that defense counsel's failure to consult with an expert was an informed, tactical decision entitled to deference. *Id.* at 331-32.

Courts in other jurisdictions have ruled that the failure to consult with an expert may be ineffective assistance under similar circumstances. In *Richey v. Bradshaw*, 498 F.3d 344, 362-64 (6th Cir. 2007), for instance, the court concluded that defense counsel's performance was constitutionally infirm because the scientific evidence was fundamental to the prosecution and counsel knew that there were gaps in the State's proof of arson. Under those circumstances, the court ruled that defense counsel's strategy merely to "poke holes in the State's arson case" was insufficient and that counsel had an affirmative duty to investigate the scientific bases for the State's expert's opinion. *Richey*, 498 F.3d at 363.

In *Duncan v. Ornoski*, 528 F.3d 1222, 1235 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 1614 (2009), the issue was whether defense counsel's performance was constitutionally deficient because he failed to consult a serologist even though the police report indicated that there were antigens in the blood sample that were inconsistent with the victim's blood type. The court ruled that counsel's performance was deficient because: (1) the opinion of the State's expert was crucial to the prosecution; (2) defense counsel had no knowledge or expertise in the field; and (3) the potentially exculpatory evidence could have played a central role in the defense. *Duncan*, 528 F.3d at 1235-36.

In *Gersten v. Senkowski*, 426 F.3d 588, 608 (2d Cir. 2005), *cert. denied*, 547 U.S. 1191 (2006), a sexual abuse case, the court ruled that defense counsel's performance was constitutionally defective because he conceded the validity of the prosecution's medical evidence without first having made any attempt to investigate whether that evidence could have been challenged. Had he consulted with an expert, the expert would have explained

that there was no physical evidence of penetration. *Id.* at 608. He, therefore, could have presented a strong affirmative case that the charged crime simply did not occur and that the victim's story was incredible. *Id.* The court observed that, although defense counsel thought that challenging the prosecution's medical evidence would have been futile, this was not an informed decision based upon reasonable investigation and, thus, was not entitled to deference. *Id.* at 609-11.

By contrast, the court in *Bower v. Quarterman*, 497 F.3d 459, 472 (5th Cir. 2007), *cert. denied*, 128 S. Ct. 2051 (2008), ruled that failing to consult with an expert was not constitutionally defective performance when the attorney was "well aware of the issues concerning the state's ballistic evidence" and there was "little, in terms of the state's ballistic evidence," for the defendant's expert to rebut. The court held that "[u]nless a critical and important legal issue rests on the reliability of scientific evidence, . . . counsel is not constitutionally required to seek a contradictory expert so long as the decision not to call an expert is informed and based on a strategic decision." *Bower*, 497 F.3d at 472.

We have found only a handful of cases involving an attorney's decision whether to consult with an accident reconstruction expert. In *Lien v. Class*, 574 N.W.2d 601, 605 (S.D. 1998), whether the defendant was the driver of the car that had killed the victim was a disputed issue. There was an eyewitness to the accident who said that the defendant was driving. *Lien*, 574 N.W.2d at 605. Defense counsel found the eyewitness to be credible and did not believe that he could impeach the witness successfully. *Id.* at 608-09. Other witnesses confirmed that the defendant had been driving the car before the accident. *Id.* at 610. Additionally, the defendant had told his attorney that when he drank, which he admitted to doing before the accident, he would not let others drive his car. *Id.* The court ruled that defense counsel's decision not to consult with an accident reconstruction expert was constitutionally sufficient performance because: (1) the attorney was an experienced criminal trial lawyer; (2) he was familiar with the area and with the type of jurors who would be on the panel; and (3) he knew that if he went to trial on an "expert" defense, the State had substantial evidence to overcome it. *Id.* at 609 (quotation omitted).

In *Strandlien v. State*, 156 P.3d 986, 993 (Wyo. 2007), on the other hand, the court ruled that there was "a clear need . . . for [the defendant's] trial counsel to consult with an independent accident reconstruction expert," because "the exact nature of how the collision occurred was vital to [the] defense." In that case, the issue was whether the defendant's impairment had proximately caused the accident that killed the victim. *Strandlien*, 156 P.3d at 993. The defendant contended at trial that the accident was unavoidable because the victim had turned into his lane. *Id.* The prosecu-

tion presented the testimony of police officers who had attempted to reconstruct the accident and who testified that, but for the defendant's impairment, it would not have occurred. *Id.*

Relying upon the above cases for guidance, we now turn to whether it was constitutionally deficient performance in this case not to consult with an expert in accident reconstruction, keeping in mind that in so doing, we must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see Sharkey*, 155 N.H. at 641.

### b. Analysis

The trial court found that the defendant's trial counsel is a seasoned criminal trial attorney, and the record amply supports this finding. At the hearing on the motion for new trial, trial counsel testified that he has been a criminal trial lawyer for approximately thirty years. He also testified that he had previously tried approximately six driving while impaired cases involving pedestrian injuries or death.

The trial court also found that the defendant's trial counsel understood the issues in the case, and rather than hire an expert, chose, instead, to cross-examine the State's expert. The record supports these findings as well. Trial counsel testified that he understood everything in DiGregorio's report, except the final paragraph, and that he understood his testimony. The defendant's trial counsel never explained why or what he did not understand in the final paragraph of DiGregorio's report. Trial counsel also testified that while he considered retaining an accident reconstruction expert, he decided not to do so because he believed that any testimony from such an expert would be speculative, and, therefore, inadmissible. He testified that because of the lack of physical evidence from the accident, he believed that the accident could not be reconstructed.

Thus, at least with respect to these factors, this case is distinguishable from *Dugas*. While the defense attorney in *Dugas* had never before tried an arson case, the defendant's trial counsel had previously tried cases that were similar to this one. *Dugas*, 428 F.3d at 329; *see Duncan*, 528 F.3d at 1235-36. Like defense counsel in *Lien*, 574 N.W.2d at 609, the defendant's trial counsel is an experienced criminal trial attorney. While defense counsel in *Dugas* needed expert assistance to understand and challenge the State's case, the defendant's trial counsel did not. *Dugas*, 428 F.3d at 329.

*Dugas* is distinguishable as well because in *Dugas*, "the arson evidence was the cornerstone of the state's case," *id.*; *see Richey*, 498 F.3d at 362; *Duncan*, 528 F.3d at 1235-36, while in this case, DiGregorio's testimony was not especially probative of the central question before the jury: whether the defendant's impairment had caused the accident. Although DiGregorio

testified that, in his opinion, the defendant was driving his car ten miles over the posted speed limit, DiGregorio did not testify that the defendant was so doing *because* he was impaired. His testimony, at best, only allowed the jury to infer that the defendant exceeded the speed limit because he was impaired. Therefore, there was little in terms of the State's evidence of causation for a defense expert to rebut. *See Bower*, 497 F.3d at 472.

Additionally, the record demonstrates that had trial counsel consulted the expert whom the defendant presented at the hearing on his motion for a new trial, this expert would have *agreed* with DiGregorio that the defendant's car was traveling ten miles over the speed limit, and would have confirmed trial counsel's suspicion that the accident could not be reconstructed because of the lack of physical evidence.

At the motion for a new trial, the defendant presented the report and testimony of Carl Lakowicz, a partner in Northpoint Collision Consultants in Gilmanton. Lakowicz admitted that because of insufficient physical evidence, it was impossible to complete "a technical accident reconstruction." Lakowicz testified that had the defendant's trial counsel contacted him, he would have told him, "We can't help you with this case. It can't be reconstructed. We're missing evidence." (Quotation omitted.) He would have explained to defendant's trial counsel that the only analysis he could conduct would require him to "assume[] certain factors that were not in evidence."

This case is, therefore, unlike *Strandlien*. Whereas in *Strandlien*, 156 P.3d at 993, the accident *could* be reconstructed and the court found defense counsel ineffective for failing to consult with an expert in such reconstruction, here, "the exact nature of how the collision occurred" was impossible to determine.

■ On the other hand, trial counsel's belief that the testimony of an expert, such as Lakowicz, would have been inadmissible because it would be speculative, was not an informed one. *See Gersten*, 426 F.3d at 609-11. Generally, under New Hampshire law, the assumptions upon which an expert bases an opinion "are matters which affect the weight of the evidence but do not [necessarily] . . . preclude its admissibility." *State v. Lavoie*, 152 N.H. 542, 546 (2005). Provided that the trial court finds that the expert's methodology is reliable, it is up to the fact finder to determine the weight and credibility to be accorded the expert's testimony. *Baker Valley Lumber v. Ingersoll-Rand*, 148 N.H. 609, 615-16 (2002). Once the trial court has determined that the expert's methodology is reliable, "[t]he appropriate method of testing the basis of an expert's opinion is by cross-examination of the expert." *State v. Fernandez*, 152 N.H. 233, 244-45 (2005) (quotation omitted). Accordingly, the fact that the testimony of an expert,

such as Lakowicz, is based upon certain assumptions, does not necessarily mean that it is inadmissible. Therefore, trial counsel's belief that it would have been futile to consult with an expert because any expert's opinion that is based upon assumptions is inadmissible was not an informed one.

Further, had trial counsel consulted an expert, such as Lakowicz, he could have learned that another defense was available to him — that the accident was unavoidable, regardless of the driver's impairment. Had trial counsel consulted an expert, such as Lakowicz, he could have been able to present an affirmative case that the defendant's impairment did not cause the accident. See Gersten, 426 F.3d at 608.

Based upon certain calculations, Lakowicz opined that under optimum night conditions, a driver of a vehicle in good working order, going up a wet hill at thirty-five miles per hour, would need 192 feet to perceive a pedestrian and come to a safe, controlled stop. Lakowicz termed this point — the 192 feet needed to stop safely — the "point of no escape." He explained that the "point of no escape" is the point at which an accident is unavoidable, regardless of the driver's level of impairment. Based upon an experiment he conducted, Lakowicz opined that an exemplar pedestrian was not detectable at the point of no escape.

Lakowicz further opined that based upon the speed of the defendant's vehicle and the presumed speed at which Hegerich walked, the first opportunity that a driver would have had to see Hegerich, even if the incident occurred during daylight, was when they were approximately 205 feet away from one another. Lakowicz opined that at a 205-foot distance, a driver would be only two seconds away from the point of no escape (192 feet), and that the reaction time for a non-impaired person driving in daylight would be approximately two and one-half seconds. Thus, from the driver's perspective, Lakowicz opined that there was no way for the accident to have been avoided regardless of the driver's impairment.

■ Based upon all of these factors, even with the presumption that his performance was constitutionally sufficient, we conclude that the decision of the defendant's trial counsel not to consult with an accident reconstruction expert was constitutionally defective performance. Contrary to trial counsel's conjecture, the testimony of an expert, such as Lakowicz, could have been admissible, even if it was based upon assumptions. Under the unique circumstances of this case, it was not sufficient for trial counsel merely to "poke holes" in the State's case. Rather, because he knew that the State's case relied upon expert testimony that used certain assumptions, it was constitutionally deficient performance for trial counsel not to consult with an expert to learn what the expert could conclude based upon these same or similar assumptions. Had he done so, he might have been able to

present an affirmative case that the defendant's impairment did not cause Hegerich's death. Under the circumstances of this case, it was constitutionally infirm performance for trial counsel to fail, at the very least, to explore this possibility with an expert in accident reconstruction.

▇ "Defense counsel may not fail to conduct an investigation and then rely on the resulting ignorance to excuse his failure to explore a strategy that would likely have yielded exculpatory evidence." *Gersten*, 426 F.3d at 610. "[F]ailing to present exculpatory evidence is not a reasonable trial strategy." *Id.* at 611.

▇ We do not intend to imply that defense counsel is constitutionally required to hire a consulting expert in *all* cases in which the prosecution calls an expert to prove an element of its case. *See Dugas*, 428 F.3d at 344 (Howard, J., dissenting). "[A]n attorney's performance is never *per se* constitutionally deficient for failing to call an expert as a result of an incomplete (or inadequate) investigation." *United States v. Mitchell*, Nos. 05-CV-823, 96-CR-401 1, 2007 WL 1521212, at *7 (E.D. Pa. May 21, 2007); *see Miller v. Anderson*, 255 F.3d 455, 459, *remand order modified by stipulation*, 268 F.3d 485 (7th Cir. 2001). Our decision today "is grounded in the specifics of this case." *Dugas*, 428 F.3d at 332 n.21.

*2. Prejudice*

▇ Because the trial court concluded that trial counsel's performance was not constitutionally infirm, it did not reach the prejudice prong of the *Strickland* test. The parties urge us to reach it in the first instance. We decline to do so. The trial court heard the testimony at the hearing on the motion for a new trial, and had an opportunity to assess the credibility of the witnesses presented in light of all of the evidence presented in support of and in opposition to the motion, and, therefore, is in a better position than we are to assess whether trial counsel's performance prejudiced the defendant. *See Dugas v. Warden*, No. 03-CV-736-JD, 2006 WL 2463670, at *15 (D.N.H. Aug. 24, 2006), *aff'd*, 506 F.3d 1 (1st Cir. 2007). In particular, the trial court is in a better position than we are to assess whether Lakowicz's testimony would have been admissible under RSA 516:29-a, New Hampshire Rule of Evidence 702 and *Baker Valley Lumber*, 148 N.H. at 616. Accordingly, we remand to the trial court for it to determine whether there is a reasonable probability that, but for trial counsel's errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694.

*Reversed and remanded.*

BRODERICK, C.J., and DUGGAN and HICKS, JJ., concurred.