Rockingham
No. 2011-595

THE STATE OF NEW HAMPSHIRE

v.

PATRICK ESCHENBRENNER

Argued: November 27, 2012
Opinion Issued: February 8, 2013
Opinion Modified: March 12, 2013

*Michael A. Delaney*, attorney general (*Nicholas Cort*, assistant attorney general, on the brief and orally), for the State.

*Green & Utter, P.A.*, of Manchester (*Philip H. Utter* on the memorandum of law and orally), for the defendant.

LYNN, J. Pursuant to RSA 606:10, III(a) (2001), the State appeals an order of the Superior Court (*Nadeau*, C.J.) granting the defendant, Patrick Eschenbrenner, a new trial on three counts of aggravated felonious sexual assault, based on the court's conclusion that the attorneys who represented him at trial provided ineffective assistance of counsel. We reverse.

I

The following facts are drawn from the record of the trial and the hearing on the defendant's motion for a new trial. In October 1998, C.T., a nine year-old female, told her mother that the defendant had touched her genital area on numerous occasions. C.T.'s mother reported the allegations to the police, but four months elapsed before C.T. was interviewed by Officer Lori Stowell of the Raymond Police Department, who had never before conducted a child sexual assault investigation. After submitting a report of her February 1999 interview with C.T., Stowell did not pursue the investigation further.

Approximately seven years later, in 2006, Raymond Police Detective Richard Labell re-opened the investigation of C.T.'s allegations. In accordance with policies and procedures developed subsequent to her 1999 interview with Stowell, C.T. was re-interviewed in 2006 at the Child Advocacy Center (CAC) by a specially trained interviewer while Labell observed from an adjacent room. Following the interview, Labell obtained a warrant for the defendant's arrest. In a post-arrest interview, the defendant denied that he had ever intentionally touched C.T.'s genital area. He was thereafter indicted on three counts of aggravated felonious sexual assault. *See* RSA 632-A:2, II (Supp. 2012).

The defense theory at trial was that C.T.'s allegations were not credible, and that if the defendant ever touched C.T.'s genitalia, he did so accidentally while playing games with her and his daughters. Thus, in his opening statement, defense counsel characterized C.T.'s accusations as a "story," said that if any touchings occurred, they were accidental, and emphasized that no official action was taken for many years after she first made her allegations.

The State presented four witnesses at trial: C.T., C.T.'s mother, Labell, and Stowell. C.T., who was eighteen years of age and a ninth-grade student at the time of trial, testified that when she was eight and nine years old she frequently went to her grandmother's house. The defendant was a neighbor of her grandmother, and C.T. would often play with the defendant's children. Sometimes the defendant would join in the play. C.T. described a game they played where the defendant threw the children into the air and then caught them and tickled them all over. C.T. indicated that during these games the defendant would touch her private area, which she described as

the part of her body below the belt that she used "to go pee." Most of this touching occurred over her shorts, but on a couple of occasions the defendant touched her under her shorts but over her underwear, and on one occasion he touched her underneath her underwear.

C.T. said that she was uncomfortable and scared when the defendant touched her underneath her underwear and that she told the defendant that she wanted to stop playing because she had to go to the bathroom. C.T. said that, on this occasion, she left the defendant's house just as his wife was pulling into the driveway, and the defendant told C.T. not to tell anyone or she would get in trouble. C.T. ran home and told her mother what had happened. C.T.'s mother took her to the police station where they spoke with an officer. Approximately four months later, C.T. returned to the police station for a taped interview. C.T. said that, after this interview, she had no further contact with the police for a long time, and that "[e]verybody called me a liar, and the neighbors' kids, [the defendant's] kids, were telling me I was a home wrecker and I just wanted to take their daddy away." In 2006, Detective Labell contacted C.T. and arranged for her to be interviewed at the CAC.

On cross-examination, C.T. acknowledged that six or seven months after she told her mother about the defendant touching her, she resumed going to the defendant's house to play with his children, although she said she then usually played "outside away from the adults." She explained that she resumed going to the defendant's house "because everybody had convinced me that I was overexaggerating about it, it never happened, and it wasn't the way it was meant to be, so I went back . . . because they were my friends."

C.T.'s mother testified that her daughter had told her about being touched by the defendant, that she brought C.T. to the Raymond police station, that she later brought her to be interviewed in February 1999, and that thereafter she heard nothing from the police until Labell contacted her in 2006. On cross-examination, she admitted to being aware that C.T. continued to play at the defendant's house even after C.T.'s disclosure of the touchings and her February 1999 police interview.

Labell testified that he had extensive experience investigating crimes against children, described the CAC interview procedure, and explained that he had observed the interview of C.T. conducted at the CAC. He then testified as follows:

Q. Okay. And based on that interview, did you do anything next?

A. Yes, I did. Based on the interview, I obtained a warrant for the arrest of Mr. Eschenbrenner.

Labell then related what the defendant told him during a post-arrest interview conducted after being advised of his *Miranda* rights. *See Miranda v. Arizona,* 384 U.S. 436 (1966). The defendant described C.T. as the oldest freshman at Raymond High School and "not the brightest girl." He acknowledged that C.T.'s grandmother lived across the street from him, that he was aware C.T. had previously accused him of touching her, and that he knew the police had been called, although they never interviewed him. He also admitted that he played a game with C.T. called "airplane," during which he would catapult the child into the air, catch her when she came down, and then tickle her from her armpits down to her inner thighs. The defendant said that it was possible he may have touched C.T.'s private parts while catching her during these games, but he denied that he had ever done so intentionally. Labell described the defendant's demeanor during the interview as "defeated," and said that at one point the defendant said, "I'm toast. I'm going to jail. My wife's dying in the hospital. I'm being accused of rape and my daughters[] are going to be alone for a very long time." When Labell asked the defendant what he meant by rape, the defendant responded: "I have a girl that's accusing me of touching her, a cop that believes it, what do you think."

Stowell testified that she first became involved in the investigation of C.T.'s allegations in October 1998. She said that her investigation of C.T.'s allegations was her first sexual assault case, that her February 1999 interview with C.T. was "fairly short," and that she had never before interviewed a child alleged to be the victim of sexual assault. Stowell also said that, after the interview, she submitted her report and the interview tape, but did not speak to anyone else or conduct further investigation. On direct examination, the prosecutor did not attempt to elicit from Stowell testimony regarding her opinion of C.T.'s demeanor during the interview.

On cross-examination, Stowell said she believed that the initial referral of the case to the police came from the New Hampshire Division for Children, Youth and Families (DCYF). She also testified that, after being assigned the matter, she made several attempts to contact C.T. and her mother, but was unsuccessful in doing so until February 1999, when she arranged for an interview with C.T. and her mother at the police station. Stowell said that there was no indication that C.T. or her mother had attempted to return to the police during the four-month period from October 1998 to February 1999, or that DCYF had conducted any follow-up investigation during this period. In addition, Stowell testified that, during the interview, C.T. appeared "carefree" and not emotionally upset about the events she was describing.

On redirect examination, without objection, Stowell gave the following testimony:

Q. You were asked about [C.T.'s] demeanor during [the February 1999] interview?

A. Yes.

Q. And at the time had you had any specific training regarding investigating sexual abuse cases involving children?

A. I had not.

Q. And subsequent to this, now, have you had training-

A. Yes, I have.

Q. — in dealing with this kind of — and would you draw the same conclusion today that you did then?

A. No.

Q. Why not?

A. Because I've learned from some of the training I've received specifically involving sexual assault and children as the victims in that, they typically tend to be disassociated from the events that occurred. It's almost a self defense mechanism to protect themselves from it.

Q. So it wouldn't be unusual for a child to not be emotionally upset by disclosing these details?

A. Correct.

Q. And have you seen that in your experience since that time?

A. Since then, yes, I have.

Q. And this was your first interview of a child?

A. Yes.

Q. Would you characterize your conclusion as a mistake?

A. Absolutely.

On recross, defense counsel elicited from Stowell that if she had concerns about her inexperience at the time of the interview, she could have sought assistance from another police officer or a supervisor. Stowell also acknowledged that, following the interview of C.T., she submitted a report for review by a supervisory officer.

In closing argument, defense counsel began by saying: "You heard my partner start this morning out by telling you that you were going to hear a story . . . . Now you've heard the story and this story doesn't make sense. And let me tell you why the story doesn't make sense." Counsel then pointed to the four-month delay between C.T.'s disclosure in October 1998 and the first police interview by Stowell in February 1999, arguing that C.T.'s mother and grandmother could have been calling the police daily if they were concerned about hastening the investigation. He described

Stowell's testimony about C.T.'s "calm, cool, collected" demeanor during the interview and stressed that the authorities took no action after the interview. He dismissed Stowell's explanation on redirect that she lacked experience, and noted that Stowell's report had been submitted to her superiors, yet still no action was taken. Counsel added that, in the years between 1999 and 2006, C.T. and her mother made "not so much as a phone call . . . to the Raymond Police Department." He also emphasized that, despite her testimony about being scared, C.T. continued to visit the defendant's house after 1999. Summarizing these points, counsel argued, "if there was a sexual assault . . . [the investigation] would have been done six years ago."

The prosecutor responded in her closing by asserting, "[I]t's not [C.T.'s] fault that it took eight years" to investigate the defendant. As to C.T.'s unemotional demeanor during the 1999 interview, the prosecutor reminded the jury of Stowell's testimony that such a reaction by a child sexual assault victim was not unusual, and argued that C.T. had "no motive to make this up." The prosecutor concluded by asking the jury to recall Stowell's testimony that her decision not to pursue the case in 1999 was a mistake, and urging the jury not to "make that same mistake today."

The defendant was convicted of all three counts of aggravated felonious sexual assault, and, on direct appeal, we affirmed his convictions in an unpublished order, *see State v. Eschenbrenner*, No. 2008-249 (N.H. Feb. 4, 2009).

In January 2011, the defendant moved for a new trial, arguing that his trial attorneys afforded him ineffective assistance of counsel. Following a hearing at which only the defendant's lead trial counsel testified, the superior court granted the defendant's motion. The court concluded that a reasonably competent attorney would have objected to: (1) Labell's testimony in which, after explaining his training and experience in child abuse cases, he stated that he had observed C.T.'s interview at the CAC and thereafter obtained an arrest warrant for the defendant; and (2) Stowell's testimony that, based upon the training she had received since her 1999 interview with C.T., she believed that her conclusion in 1999 not to pursue the investigation was a mistake. The court determined that the testimony in question was expert testimony that the State had not disclosed to the defense before trial, and that both Labell and Stowell had improperly conveyed to the jury that they believed C.T.'s allegations. The court found that defense counsel's failure to object most likely came from insufficient preparation, was not part of trial strategy, and caused the defendant actual prejudice. After the court denied the State's motion for reconsideration, this appeal followed.

On appeal, the State argues that the defendant's trial attorneys were not constitutionally ineffective for failing to object to the disputed testimony of Labell and Stowell. Specifically, the State contends that an objection to Labell's testimony would have been futile because it merely provided context necessary for the jury to understand how Labell came to interview the defendant and obtain his statements. As to Stowell's testimony on redirect examination, the State contends that an objection also would have been unsuccessful because it was admissible under the doctrine of specific contradiction. Further, the State argues that Stowell's redirect examination testimony did not cause the defendant actual prejudice because no reasonable probability exists that the outcome of the trial would have been different had the trial court excluded this testimony.

## II

The State and Federal Constitutions guarantee a criminal defendant reasonably competent assistance of counsel. N.H. CONST. pt. I, art. 15; U.S. CONST. amend. VI; *see State v. Kepple*, 155 N.H. 267, 269 (2007). "To demonstrate a violation of this right, the defendant must show that his trial counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *State v. Fecteau*, 140 N.H. 498, 500 (1995) (quotation omitted). We examine the constitutional competency of counsel's performance under the State Constitution, and rely upon federal case law to aid in our analysis. *State v. Whittaker*, 158 N.H. 762, 768 (2009). "Because the standard for determining whether a defendant has received ineffective assistance of counsel is the same under both constitutions, necessarily, we reach the same result under the Federal Constitution as we do under the State Constitution." *Id.*

To assert a successful claim for ineffective assistance of counsel under the State Constitution, a defendant must show, first, that counsel's representation was constitutionally deficient and, second, that counsel's deficient performance actually prejudiced the outcome of the case. *State v. McGurk*, 157 N.H. 765, 769 (2008). To satisfy the first prong, the defendant must show that counsel made such egregious errors that he or she failed to function as the counsel guaranteed by the State Constitution. *Id.* We afford broad discretion to trial counsel when determining a trial strategy, *id.*, and we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Hall*, 160 N.H. 581, 584-85 (2010) (quotation omitted). To satisfy the second prong, the defendant must demonstrate actual prejudice by showing that there is a reasonable probability that the result of the proceeding would have been different had competent legal representation been provided. *McGurk*, 157

N.H. at 769. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the case. *Id.*

■When we determine that a defendant has failed to meet either prong of the test, we need not consider the other one. *Kepple*, 155 N.H. at 270. Both the performance and prejudice prongs of the ineffectiveness inquiry are mixed questions of law and fact. *Hall*, 160 N.H. at 585. Therefore, we will not disturb the trial court's factual findings unless they are not supported by the evidence or are erroneous as a matter of law, and we review the ultimate determination of whether each prong is met *de novo. Id.*

We first address the issues regarding Stowell's testimony and then consider the impact of Labell's testimony.

## A

The trial court ruled that the defendant's attorneys should have objected to Stowell's redirect testimony because the State had not disclosed her as an expert witness and because the testimony conveyed to the jury that she believed C.T. We disagree with the trial court on both points.

■ First, assuming, without deciding, that Stowell provided expert testimony, we conclude that any objection to it on the basis that the State had not disclosed her as an expert witness would not have been successful. The record reveals that the prosecutor did not elicit any expert testimony from Stowell during her direct examination. Not until after the defendant's attorneys cross-examined Stowell about C.T.'s carefree and unemotional demeanor during the February 1999 interview did she discuss on redirect examination the post-interview knowledge she had acquired about the disassociative behavioral characteristics of child victims of sexual abuse, and express the view that, in retrospect, she had reached a mistaken conclusion in not pursuing the investigation. It is important to emphasize that the defendant makes no claim that his trial counsel were ineffective in choosing to pursue the aforesaid line of cross-examination.[1] Indeed, doing so was obviously crucial to the defense's effort to establish that C.T.'s allegations were not credible; and defense counsel readily acknowledged in his testimony at the new trial motion hearing that the defense team, including the defendant, was aware that such cross-examination would open

---

[1] The defendant did argue in the trial court that his counsel should have objected to Stowell being allowed to testify at all, but he conceded that this alleged error did not amount to ineffective assistance of counsel. However, the defendant never asserted below that, given the fact Stowell did testify as a witness for the State, the cross-examination of Stowell conducted by his trial counsel constituted ineffective representation.

the door "to that type of redirect" the State elicited from Stowell.[2] The policy underlying expert witness disclosure requirements is to prevent unfair surprise, *see Gulf Ins. Co. v. AMSCO*, 153 N.H. 28, 33 (2005), not to thwart fair rebuttal of issues raised during cross-examination. *See O'Donnell v. Moose Hill Orchards*, 140 N.H. 601, 604 (1996) (trial court did not err as a matter of law when it ruled that a party's failure to disclose an expert witness did not bar witness's testimony where opposing party was prepared for such testimony); *Miller v. State*, 28 A.3d 675, 686 (Md. 2011) (upholding trial court's decision to allow expert's testimony on redirect examination over a discovery objection because questioning on cross-examination opened the door to such testimony).

Second, we are not persuaded that the defendant's attorneys could have successfully objected to Stowell's redirect examination testimony on the basis that it conveyed to the jury that she believed C.T. Assuming, without deciding, that Stowell's testimony at least implied that she believed C.T., we conclude that any objection on this ground would have been unavailing. On cross-examination of Stowell, the defendant's attorneys elicited testimony that C.T. appeared carefree and unemotional during her February 1999 interview, and emphasized that Stowell discontinued her investigation after the interview. The clear purpose of this line of cross-examination, as defendant's trial counsel admitted, was to convey to the jury the impression that Stowell did not find C.T. credible. To rebut the misleading impression that Stowell's opinion had not changed, the State was entitled to elicit from Stowell on redirect examination that, based on her training and experience acquired subsequent to the interview, her original assessment as to the import of C.T.'s demeanor and resultant conclusion not to pursue the investigation were mistaken. *See State v. Wamala*, 158 N.H. 583, 589 (2009) (doctrine of specific contradiction allows introduction of otherwise inadmissible evidence to counter misleading impression created by admissible evidence introduced by opponent); *State v. Carlson*, 146 N.H. 52, 56 (2001) (same). Furthermore, Stowell did not directly opine that she believed C.T.

---

[2] In his memorandum of law, the defendant repeatedly asserts that, at trial, his counsel never accused C.T. of lying, and that the theory of defense instead was that C.T. had simply misinterpreted what were, at most, merely inadvertent touchings by the defendant that may have occurred while playing the airplane game. While we agree that defendant's trial counsel made a deliberate tactical decision not to call C.T. a liar before the jury, we do not agree that the defense theory was limited to the claim that C.T. innocently misinterpreted what had happened. Such a theory would not have accounted for C.T.'s testimony that the defendant told her not to tell anyone about the touchings and that she would get in trouble if she did. Rather, the defendant's lead trial counsel clearly was correct when he testified that the defense asked the jury to conclude that C.T.'s "story" was a lie which no one, including Officer Stowell, C.T.'s mother, and C.T. herself believed to be true, as evidenced by the facts that (1) for seven years no one thought the investigation worth pursuing, and (2) even after she reported the touchings to the police, C.T. continued to go to the defendant's house to play.

was telling the truth; she merely related that she had learned since her interview with C.T. that child victims of sexual assault typically exhibit disassociative behavior, and indicated how this new information persuaded her that her original conclusion not to pursue the investigation was a mistake. *Cf. State v. Cressey*, 137 N.H. 402, 412 (1993) (holding that "State may offer expert testimony explaining the [counterintuitive] behavioral characteristics commonly found in child abuse victims to rebut any inferences that a child victim witness is lying"); *State v. MacRae*, 141 N.H. 106, 110 (1996) (expert testimony that allows a jury to draw inferences that tend to bolster victim's credibility is not inadmissible because "[s]o long as the expert does not render an opinion on the accuracy of the victim's recitation of facts, his or her general testimony on the dynamics of sexual abuse does not prejudice the jury" (quotation omitted)).

■ Finally, although the defendant's trial counsel testified that he did not know that Stowell had received sexual assault training subsequent to her interview with C.T., he also testified that he and co-counsel considered the "pros and cons" of cross-examining Stowell and determined that proceeding with the cross-examination was important to the defendant's theory of defense, *i.e.*, that nobody, including Stowell and her supervisors, believed C.T.'s allegations of abuse. Thus, we are satisfied that the decision to cross-examine Stowell and expose the defendant to potentially detrimental redirect examination testimony was a "calculated risk falling within the limits of reasonable practice." *Fecteau*, 140 N.H. at 502 (quotation omitted) (not constitutionally deficient to open the door to defendant's prior arrest); *State v. Perron*, 122 N.H. 941, 949-50 (1982) (not ineffective assistance to open the door to bad character evidence of the defendant).[3] We cannot say that the defendant's attorneys' performance was constitutionally deficient.

---

[3] The defendant argues that the trial court made factual findings: (1) that the "trial strategy" explanation offered by defendant's lead trial counsel as the reason for not objecting to Stowell's redirect testimony was not credible; and (2) that the "failure to object . . . most likely came from insufficient preparation." He contends that we are bound by these findings. The problem with this argument is that these findings were premised entirely on the trial court's *legal conclusion* that the defendant's trial counsel could have successfully objected to Stowell's redirect testimony. As explained in the text, that conclusion was erroneous, and the court's reliance on it completely undercut the basis of its factual findings on the above points.

Moreover, while we readily agree with the defendant that credibility determinations fall within the province of the trial court, *see State v. Ayer*, 154 N.H. 500, 519 (2006), the fact remains that it was the defendant's burden to establish that his trial counsel's performance was constitutionally deficient. The trial court did not find that trial counsel were ineffective because of the nature of their cross-examination of Stowell; the court faulted counsel only for failing to object to Stowell's redirect examination. Even if we entirely discount trial counsel's testimony as to his trial strategy explanation, the record is devoid of evidence showing how any amount of further preparation by trial counsel would have permitted the defendant to successfully exclude Stowell's redirect testimony given the theory of defense presented at trial and the cross-examination of Stowell pursued in support of that theory.

*Compare State v. Thompson*, 161 N.H. 507, 530-31 (2011) (attorney's repeated failure to object was illogical, manifestly unreasonable, and completely irrational).

Because we conclude that the defendant's attorneys' failure to object to Stowell's redirect examination testimony was not constitutionally deficient, we need not consider whether it caused the defendant actual prejudice. *Kepple*, 155 N.H. at 270.

B

Turning to Labell's testimony, the State's notice of appeal does not dispute the trial court's ruling that a reasonably competent attorney would have objected to this testimony. Accordingly, the State has waived its argument that the court erred in reaching this conclusion. *Appeal of Keelin B.*, 162 N.H. 38, 48 (2011).

■ However, in addressing the issue of prejudice, the trial court did not separately analyze the testimony of Labell and Stowell. Instead, the court found a reasonable probability that the outcome of the trial would have been different if the relevant portions of both officers' testimony had been excluded from evidence. Normally, in such circumstances, a remand to the trial court would be appropriate to determine whether Labell's disputed testimony alone caused the defendant actual prejudice. Here, however, a review of the entire trial record makes it abundantly clear that there is no reasonable probability the outcome of the trial would have been different absent the challenged portion of Labell's testimony. *See State v. Berry*, 148 N.H. 88, 92 (2002) (when "record reveals that a reasonable fact finder necessarily would reach a certain conclusion, we may decide th[e] issue as a matter of law").

■ At most, Labell only indirectly revealed that he regarded C.T. as credible. He did not inform the jury that he believed C.T., nor did he directly comment either on her allegations or on her demeanor during the CAC interview. On the contrary, the most reasonable interpretation of his testimony is that, based on C.T.'s interview at the CAC and the officer's background and experience, the police had sufficient grounds to arrest and question the defendant as to his version of what occurred. *See Gomez v. State*, 68 P.3d 1177, 1180-81 (Wyo. 2003) (officer's testimony that another officer radioed that there was enough evidence and that the defendant could be arrested "showed only that there was sufficient evidence to warrant an arrest . . . [and] cannot, therefore, be accurately characterized as vouching for the truth of the victim's testimony"). Such testimony is not prejudicial, and did not become so merely because Labell also testified about his background and experience and that he obtained an arrest

warrant for the defendant. *Compare State v. Reynolds*, 136 N.H. 325, 328-29 (1992) (state trooper's testimony that victim's contradictory testimony should not diminish her credibility was not harmless beyond a reasonable doubt).

■■ We agree with the defendant that the issues of when and why he was arrested were irrelevant to whether he committed the sexual assaults. Indeed, the trial court specifically instructed the jury that the fact the defendant had been arrested or indicted could not be considered as evidence of the defendant's guilt, and we presume that the jury followed such instructions. *See State v. Pepin*, 156 N.H. 269, 279 (2007). But, as the defendant concedes,[4] Labell's testimony about the defendant's arrest was relevant for an independent reason — to provide context for the jury to understand how Labell came to interview the defendant and why, before doing so, he advised the defendant of his *Miranda* rights.

For these reasons, and in light of all the testimony presented at trial, including C.T.'s description of the assaults, we conclude that the defendant's attorneys' failure to object to Labell's testimony did not cause the defendant actual prejudice.

*Reversed.*

DALIANIS, C.J., and HICKS, CONBOY and BASSETT, JJ., concurred.

Merrimack
No. 2011-786

---

[4] The defendant agrees that it would have been proper for the State to ask Labell if he interviewed the defendant and whether the defendant was under arrest at the time.